Calvin C. BAILEY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 00–93C.

United States Court of Federal Claims.

March 13, 2002.

---

Martin A. Kilpatrick, Greenville, MS, for plaintiffs.

Carolyn J. Craig, with whom were Assistant Attorney General David W. Ogden, David M. Cohen, and Donald E. Kinner, Washington, D.C., for defendant.

## OPINION

WILSON, Judge.

Plaintiff employees allege in this action that their employer, the Army Corps of Engineers (the Corps), violated the Federal Travel Regulation, 41 C.F.R. pts. 300–304 (2000), by failing to reimburse certain travel expenses. This matter is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

The major issue presented is whether an amendment to the Civil Service Reform Act (CSRA), 5 U.S.C. § 7121(a)(1) (2000), making negotiated grievance procedures the

"exclusive administrative procedure" for resolving grievances, continues to foreclose judicial review of grievable claims. The Court of Federal Claims is divided in its response to this question. *Compare Abramson v. United States,* 42 Fed.Cl. 621 (1998) (holding that § 7121(a)(1), as amended, is no longer an impediment to judicial review), *and Abbott v. United States,* 47 Fed.Cl. 582 (2000) (same) *with O'Connor v. United States,* 50 Fed.Cl. 285 (2001), *appeal docketed,* No. 02–5016 (Fed.Cir. Oct. 25, 2001) (concluding that the 1994 amendment did not restore jurisdiction over employment-related claims), *and Mudge v. United States,* 50 Fed.Cl. 500 (2001) (same), *and Addison–Taylor v. United States,* 51 Fed.Cl. 25 (2001) (same). Upon careful consideration of the briefs and oral argument, this court holds that § 7121(a)(1), as amended, does not foreclose judicial review of the employment dispute at issue here. Defendant's motion to dismiss the union employees' complaint for lack of subject matter jurisdiction is therefore denied. With respect to the non-union plaintiffs, the court denies the motion to dismiss for lack of subject matter jurisdiction, but remands the issue to the agency for administrative exhaustion. Although exhaustion is not mandatory under the statutory scheme, for the reasons discussed below, the court finds that requiring exhaustion by the non-union employees will expedite the resolution of this matter.

### BACKGROUND

Plaintiffs' employment entails "sinking" concrete blocks into the Mississippi River to manipulate its river bank boundaries. Plaintiffs perform this work at various points along the river and therefore are required to be away from their homes for extended periods. The Corps provides living quarters and meals to employees aboard boats that travel along the river and transport employees to the work sites. On days when they are not working, Corps employees may and do travel from river work sites to their homes. The Corps has refused to reimburse plaintiffs for the expenses associated with this travel.

This case involves twenty-three plaintiffs and two collective bargaining agreements (CBAs). The 1980 CBA was in effect from 1980 until 1996. The 1996 CBA took effect on November 26, 1996 and is currently in force. Each CBA defined its respective bargaining unit as including "all nonprofessional, and nonsupervisory, General Schedule (GS) and Wage Grade (WG) permanent, seasonal, and temporary employees of the U.S. Army Corps of Engineers, Vicksburg District." (Def.'s Mot. Dismiss App. at 4.) Both CBAs expressly excluded supervisors and managers from the bargaining unit. Eighteen of the twenty-three plaintiffs are currently members of a bargaining unit covered by the 1996 CBA. Two plaintiffs are no longer employed in the bargaining unit but were covered by the 1980 CBA at the time their claims arose. The remaining three plaintiffs have never been covered by a CBA.

The Civil Service Reform Act requires federal collective bargaining agreements to contain grievance procedures. 5 U.S.C. § 7121(a)(1) ("[A]ny collective bargaining agreement shall provide procedures for the settlement of grievances."). As originally enacted, § 7121(a)(1) provided that "the [negotiated] procedures shall be the *exclusive procedures* for resolving grievances which fall within its coverage." 5 U.S.C. § 7121(a)(1) (1988) (amended 1994) (emphasis added). Several subsections of § 7121 limit the scope of the exclusivity provision. Section 7121(a)(2) provides that "[a]ny collective bargaining agreement may exclude any matter from the application of the grievance procedures." Additionally, subsections (d), (e), and (g) of § 7121 enumerate certain disputes that federal employees may resolve either through the negotiated procedures or an available statutory procedure.[1] For federal

---

1. Subsection (d) provides that an aggrieved employee affected by a prohibited personnel practice under 5 U.S.C. § 2302(b)(1) may raise the matter under a statutory procedure or a negotiated procedure. Subsection (e) provides that for matters covered by 5 U.S.C. § 4303 (actions based on unacceptable performance) and § 7512 (adverse actions), an employee may use a negoti-

ated procedure or the appellate procedures of 5 U.S.C. § 7701 to resolve a dispute. Subsection (g), added in 1994, provides that an employee may seek relief for any prohibited personnel practice, except those to which subsection (d) applies, with the Merit Systems Protection Board (MSPB), through a negotiated procedure, or an

employees covered by a collective bargaining agreement that did not exclude disputes addressed by other statutes and regulations, the Federal Circuit interpreted § 7121(a)(1) of the CSRA as precluding judicial review. Most notably, in *Carter v. Gibbs,* 909 F.2d 1452 (Fed.Cir.1990), the Federal Circuit held that unionized IRS employees claiming that the IRS violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1994), by failing to pay them overtime premiums were precluded from federal judicial review of their dispute because the text of § 7121(a)(1) unambiguously expressed Congress' intent to make the negotiated procedures the "exclusive procedures" for resolving grievable disputes, unless such disputes were expressly excluded by the terms of the collective bargaining agreement. *See also Adams v. United States,* 979 F.2d 840 (Fed.Cir.1992) (following *Carter*); *Aamodt v. United States,* 976 F.2d 691 (Fed.Cir.1992) (same); *Muniz v. U.S.,* 972 F.2d 1304 (Fed.Cir.1992) (same).

In 1994, Congress amended the CSRA by inserting "administrative" after "exclusive" in § 7121(a)(1). United States Office of Special Counsel, Merit Systems Protection Board: Authorization, Pub.L. No. 103–424, § 9(c), 108 Stat. 4361, 4366 (1994) (the 1994 amendment). Thus, § 7121(a)(1) no longer makes negotiated procedures the exclusive procedures for resolving grievable disputes; it states that negotiated procedures are the "exclusive administrative procedures" for resolving such disputes. *Id.*[2]

Both the 1980 and 1996 collective bargaining agreements define "grievance" broadly as "[a]ny Complaint … by any bargaining unit employee concerning any matter relating to the employment of the employee." (Def.'s Mot. Dismiss App. at 11, 32.) Neither party disputes that the Corps' failure to reimburse certain travel expenses relates to plaintiffs'

employment and therefore fits within the CBA's definition of "grievance." The 1980 CBA tracks the CSRA's pre-amendment language in providing that the negotiated procedures are the exclusive procedures available for resolving grievances. (*Id.* at 33.) This exclusivity provision is absent from the 1996 CBA, which was negotiated after the passage of the 1994 amendment to the CSRA making negotiated procedures the exclusive administrative procedure for resolving disputes. (*Id.* at 11–23.) Neither CBA excluded travel pay claims from the coverage of the grievance procedure. Therefore, plaintiffs could have grieved their travel pay dispute. Although several plaintiffs questioned their supervisors about travel expenses, neither the union employees nor the non-union employees filed a formal grievance pursuant to the CBA's negotiated procedures provision, or the agency's Administrative Grievance System (AGS). (Pl.'s Resp. at 2; Ex. A; Ex. C.)

## DISCUSSION

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). The Tucker Act, 28 U.S.C. § 1491(a)(1), grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded … upon … any regulation … in cases not sounding in tort." Because the Tucker Act is merely a grant of jurisdiction and does not create any substantive right enforceable against the United States, the regulation in question must create a substantive right to money damages. *Tippett v.*

---

employee may seek corrective action under 5 U.S.C. §§ 7511–7521.

**2.** Since the passage of the 1994 amendment, the Federal Circuit has affirmed dismissals pursuant to § 7121(a)(1) of the CSRA. *See Hickman v. United States,* 232 F.3d 906 (Fed.Cir.2000), *aff'g without an opinion,* 43 Fed.Cl. 424 (1999) (summarily affirming a dismissal of a grievable claim by the Court of Federal Claims, which did not address the effect of the 1994 amendment in its opinion); *Dunklebarger v. MSPB,* 130 F.3d 1476

(Fed.Cir.1997) (affirming MSPB's dismissal of the plaintiff's claim for lack of subject matter jurisdiction). However, these cases did not squarely present the Federal Circuit with the issue of this court's jurisdiction over employee complaints in light of the 1994 amendment. That issue is now before the Circuit in the appeal of *O'Connor v. United States,* 50 Fed.Cl. 285 (2001), *appeal docketed,* No. 02–5016 (Fed.Cir. Oct. 25, 2001).

*United States*, 185 F.3d 1250, 1254–55 (Fed. Cir.1999). Plaintiffs allege that the Corps violated the Federal Travel Regulation (FTR), 41 C.F.R. pts. 300–304 (2000), by failing to reimburse certain travel expenses. The FTR, which provides that federal employees who are performing official travel are eligible to be reimbursed for transportation expenses, 41 C.F.R. § 301–10, is a money-mandating provision of law. *Eastman v. United States*, 33 Fed.Cl. 293, 298 (1995). Thus, absent a statute to the contrary, the court has Tucker Act jurisdiction over plaintiffs' claim.

*Statutory Amendment*

The court relies on well-established canons of statutory construction in construing the amended § 7121(a)(1) of the CSRA. "As in any case of statutory construction, our analysis begins with the language of the statute .... And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (internal citations omitted). Plaintiffs rely on, and *Abramson* and *Abbott* adopted, the ordinary legal meaning of "administrative," defined by *Black's Law Dictionary* as "distinguished from such [functions and acts] as are judicial." *Black's Law Dictionary* 45 (6th ed.1990). Defendant urges the court to interpret the meaning of "administrative" in the context of the structure and purpose of the CSRA and to reject what *O'Connor* characterized as "obeisance to the dictionary definition of the word 'administrative' to the exclusion of other considerations ...." 50 Fed.Cl. at 291. Foremost among these considerations, according to *O'Connor*, is the legislative "premise that collectively bargained grievance procedures are the preferred method of dispute resolution for unionized employees." *Id.*

Setting aside the issue of reliance on such extrinsic aids as legal dictionaries, a fairly typical jurisprudential aid in statutory interpretation,[3] the court finds that the plain meaning of administrative, as distinct from

judicial, is well grounded in legal precedent. *See, e.g., Koppel, Inc. v. United States*, 612 F.2d 1264, 1268 (10th Cir.1979) ("Sometimes [resorting to an administrative agency] is required because the function being exercised is in its nature administrative in contradistinction to judicial.") (citing *Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922)). The Supreme Court in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), recognized that "[the CSRA] prescribes in great detail the protections and remedies applicable to [adverse personnel] action, including the availability of *administrative and judicial* review." *Fausto*, 484 U.S. at 443, 108 S.Ct. 668 (emphasis added). The CSRA's treatment of administrative and judicial review in separate sections underscores the distinction. *Compare* 5 U.S.C. § 7701 (providing for administrative review by the MSPB of certain adverse personnel actions), *with* 5 U.S.C. § 7703 (providing for judicial review of MSPB decisions); *see also* Congressional Accountability Act of 1995, 2 U.S.C. 1361(d)(1) (Supp. II 1995) ("[N]o person may commence an *administrative or judicial* proceeding to seek a remedy for the rights and protections afforded by this chapter except as provided in this chapter.") (emphasis added).

Giving force to the plain meaning of the term "administrative" as distinct from "judicial" does not entirely dispose of the issue of Congress' intent. The government argues, and *O'Connor, Mudge,* and *Addison–Taylor* determined, that Congress intended, in adding the term "administrative" to the statute, merely to "emphasize that, unless an employee fell within the narrowly defined class of employees covered by the new subsection (g), which provides for additional administrative remedial channels for certain prohibited personnel practices, the negotiated grievance procedure, rather than access to the MSPB, would be the only available remedy." *O'Connor*, 50 Fed.Cl. at 293; *see also Mudge*, 50

---

**3.** A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 72 (1994) ("Since [1989], more and more disputes about the meaning of statutes are greeted with citations to dic-

tionaries."); Thomas W. Merrill, *Textualism and the Future of the Chevron Doctrine*, 72 Wash. U. L.Q. 351 (1994) (providing statistics on the increasing role that dictionaries have played in statutory interpretation).

Fed.Cl. at 505, *Addison–Taylor*, 51 Fed.Cl. at 32. However, construing the addition of the term administrative "to clarify the exclusivity of the grievance procedure as against different administrative procedures that might otherwise be available [such as an MSPB appeal]" requires "emphasis ... on the word 'exclusive' and not on the word 'administrative.'" *Addison–Taylor*, 51 Fed.Cl. at 32. It is not the task of the court to rewrite the statute by emphasizing the word that qualifies "administrative," or by reading it out of the statute entirely because it conflicts with the goals of the original statute. As the Supreme Court noted in *Artuz v. Bennett,* "[w]hatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them." 531 U.S. 4, 10, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000), *quoted in Superior Fireplace Co. v. Majestic Prods. Co.,* 270 F.3d 1358, 1378–79 (Fed.Cir.2001) (Dyk, J., dissenting).

■ The government's interpretation conflicts with the presumption that Congress intends to change the law when it enacts amendments. *See Wallace v. Jaffree,* 472 U.S. 38, 59 n. 48, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (applying the "common-sense presumption" that statutes are usually intended to change existing law); *Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 560, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963) ("We would not lightly conclude that a congressional enactment has no purpose or function."). It seems unlikely that Congress, by adding the word "administrative" between "exclusive" and "procedures," intended to emphasize what the Federal Circuit in *Carter* determined was an obvious and unambiguous implication of the original provision. 909 F.2d at 1454 ("The [original] Civil Service Reform Act is unambiguous: the [negotiated] procedures shall be the exclusive procedures for resolving grievances which fall within its coverage.") (internal quotations omitted). As *Abramson* noted, "the previously-existing exceptions in subsections (d) and (e), neither of which was amended in 1994, both offer a choice between appellate and administrative remedies in the same way as new subsection (g). Thus, subsection (g) could not have

created any new need for emphasis in 7121(a)." 42 Fed.Cl. at 630–31.

■ The amendment's legislative history, which states expressly that the purpose of the amendment was not to reemphasize *Carter's* holding, but rather to repeal it, reinforces the plain meaning of the amendment's text. Courts typically rely on legislative history in construing statutes only if the text is considered ambiguous. *See, e.g., Dick v. Office of Personnel Mgmt.,* 216 F.3d 1353, 1356 (Fed.Cir.2000) ("Since the statute is ambiguous with respect to its application to this case, we have reviewed the legislative history of the amendment."). Although this court considers the meaning of the amendment plain, in light of the court's divergent interpretations of the amended statute, the amendment's legislative history is instructive.

The government argues that the direct legislative history of H.R. 2970 (the bill number for the 1994 amendment) relied on by plaintiffs deserves little weight because it consists of hearing testimony by an interested party, and not the views of a lawmaker. Plaintiffs rely on the hearing testimony of a National Treasury Employees Union (NTEU) attorney, who urged that "the law should be clarified that [the negotiated procedures] would only be the *exclusive administrative remedy* but would not foreclose judicial remedies contained in other statutes ...." *To Reauthorize the Office of Special Counsel and to Make Amendments to the Whistleblower Protection Act: Hearing on H.R. 2970 Before the Subcomm. on the Civil Service of the House Comm. on Post Office and Civil Serv.,* 103d Cong. 21 (1993) (statement of Tim Hannapel, assistant counsel in the Office of General Counsel, NTEU) (emphasis added). Pointing to the Federal Circuit's decision in *Carter v. Gibbs,* the NTEU witness further testified that "Congress intended the grievance procedure to be a strong avenue but courts have misinterpreted that intent to take away the individual rights of individual employees under, for example, the overtime pay statutes and the Privacy Act to go to court." *Id.* Echoing this suggestion, the NTEU's President proposed "a change to existing law, as interpreted by the Federal Circuit in *Carter v. Gibbs,* to

ensure that the negotiated grievance procedure is the *exclusive administrative procedure*, but does not supplant any remedies which allow Federal employees to be heard directly in Federal court." *Id.* at 23 (prepared statement of Robert M. Tobias, President, NTEU) (emphasis added).

To the extent that other decisions of this court have considered the amendment's direct legislative history, they have dismissed the hearing testimony as reflective solely of the views of an interest group rather than of Congress. *Mudge,* 50 Fed.Cl. at 504; *Addison–Taylor,* 51 Fed.Cl. at 33. Without doubt, hearing testimony is not the most persuasive evidence of congressional intent. However, courts have considered hearing statements in the course of statutory construction. *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 273–74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (relying on hearing statement by a representative of the Chamber of Commerce in construing a specific statutory term); *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 151 n. 18, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (relying on hearing statements of union representative); *Ulmet v. United States,* 822 F.2d 1079, 1083 (Fed.Cir.1987) (relying on hearing statements in concluding that plain text was not overcome by clear, contrary legislative history).

When it appears from the timing of the amendment and the content of the textual addition that Congress was responding to an interested party's proposal, it is permissible to conclude that Congress shared the interested party's intent. *S.E.C. v. Robert Collier & Co.,* 76 F.2d 939 (2d Cir.1935) (relying on hearing testimony to interpret subsequent bill amendment that reflected changes suggested by the witness); 2A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 48:10 (6th ed.2000) ("[I]f the legislature adopts an amendment urged by a witness, it may be assumed that the intent voiced was adopted by the legislature."). Although the Supreme Court has cautioned against attributing to Congress "an official

purpose based on the motives of a particular group that lobbied for or against a certain proposal," *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 120, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), it has also accorded weight to the views of interested parties with a particular expertise in the subject matter at issue. *Chicago & Northwestern Ry. Co. v. United Transp. Union,* 402 U.S. 570, 576, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (according statements of labor and management representatives "great weight in the construction of the [Railway Labor] Act" because of their role in its enactment). In light of the NTEU's congressionally-recognized role in developing federal-sector labor legislation,[4] the hearing statements proposing an amendment to make the negotiated procedures the exclusive administrative procedures are entitled to consideration.

Plaintiffs' argument that Congress intended to restore judicial review by amending the statute also finds support in the legislative history of another bill that, like the 1994 amendment to the CSRA, inserted "administrative" after "exclusive" in § 7121(a)(1). The House Report for the Federal Employee Fairness Act of 1994 (FEFA) of the Committee on Education and Labor, H.R.Rep. No. 103–599(I), explicitly stated that the purpose of the addition of the word "administrative" in the FEFA was to repeal *Carter v. Gibbs,* which denied federal employees the right to judicial review of grievable FLSA claims. Specifically, the House Report explained that the proposed amendment:

clarifies Congress' original intent that the grievance procedure would be an exclusive administrative procedure for matters that it covers. The grievance procedure was never intended to deprive employees of access to the courts. This clarification is necessary to correct an erroneous decision of the U.S. Court of Appeals for the Federal Circuit, *Carter v. Gibbs,* 909 F.2d 1452 (Fed.Cir.1990), *cert. denied sub nom. Carter v. Goldberg,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), which denied employees the right to judicial review of

---

4. Referring to Robert Tobias, the NTEU President who made one of the hearing statements, Senator Warner stated, "[he] has been instru-

mental in developing and enacting major legislation [a]ffecting federal employees ...." 145 Cong. Rec. S9110 (daily ed. July 22, 1999).

claims under the Fair Labor Standards Act.

H.R.Rep. No. 103–599(I), at 56 (1994). The House Report of the Committee on Post Office and Civil Service, to which the bill also was referred, similarly stated that "the purpose of this amendment is to clarify that section 7121 is not intended to limit judicial remedies otherwise provided by law." H.R.Rep. No. 103–599(II), at 75 (1994).

■ FEFA was ultimately not enacted and thus, as *Addison–Taylor* points out, serves as indirect rather than direct legislative history for the amendment enacted through H.R. 2970. However, the Supreme Court considers the legislative history of an unenacted bill "wholly relevant to an understanding of" a subsequently enacted statute containing the same operative language. *United States v. Enmons*, 410 U.S. 396, 405 n. 14, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); *see also Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341, 1347 n. 1 (Fed.Cir. 2001); *Amin v. MSPB*, 951 F.2d 1247, 1250 n. 1 (Fed.Cir.1991).[5] Like the hearing statements, the FEFA committee reports are not the *most* persuasive evidence of legislative intent. However, they are worthy of some consideration and they support the plain language of the amendment, which is paramount.

Defendant also argues that the addition of the term "administrative" to § 7121(a)(1) by means of a "Technical and Conforming Amendment" in a section entitled "Authorities Relating to Arbitrators and Choice of Remedies *Not Involving Judicial Review*," § 9, 108 Stat. at 4365–66, suggests that Congress did not intend to restore judicial review. Relying on *Addison–Taylor*, the government argues that these section headings "caution against reading into [§ 7121(a)(1)] the drastic changes plaintiffs propose." 51

Fed.Cl. at 34. As the Supreme Court has noted, however, "a statute is a statute, whatever its label." *United States v. R.L.C.*, 503 U.S. 291, 305 n. 5, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) (responding to the dissent's criticism that the Court's ruling gave sweeping effect to a "technical amendment."). The Court in *R.L.C.* applied the customary tools of statutory construction, including the technical amendment's legislative history. *Id.*[6]

■ While the text and legislative history are important factors in statutory construction, the court also "must ... interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[ ] harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal citations omitted). "A strong preference has been articulated for courts to interpret statutory language so as to preserve, rather than destroy, the statutory scheme." *O'Connor*, 50 Fed.Cl. at 290 (citing *United States v. Fausto*, 484 U.S. 439, 452–53, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). Defendant argues, and *Mudge*, in particular, is persuaded that construing § 7121(a)(1) to repeal *Carter v. Gibbs* would render superfluous § 7121(a)(2), which allows employer and employee to exclude certain types of disputes from a CBA's negotiated procedures. Moreover, according to defendant, interpreting § 7121(a)(1) to allow judicial review of grievable claims would frustrate the main purpose of the CSRA, which is to provide a comprehensive administrative remedial scheme for the personnel claims of federal employees. With respect to the former argument, the court acknowledges that one function of § 7121(a)(2) is diminished, but other purposes served by the provision remain intact.

---

5. Significantly, Congress deliberated over the adoption of FEFA and the 1994 amendment simultaneously. Both amendments were referred to the House Committee on Post Office and Civil Service at approximately the same time, and the 1994 amendment passed houses less than two moths after FEFA was placed on the Union Calendar. *See* http://thomas.loc.gov (providing bill summary information for both the 1994 amendment and FEFA).

6. *But see Director of Revenue v. CoBank ACB*, 531 U.S. 316, 324, 121 S.Ct. 941, 148 L.Ed.2d 830 (2001) (declining to interpret a technical and conforming amendment as effecting a change in the taxation of banks for cooperatives). Unlike the technical amendment in *CoBank*, which deleted statutory language, the 1994 addition of "administrative" to the CSRA expressly effects a change in the statute by affirmatively limiting the scope of § 7121(a)(1) to administrative fora.

The latter argument is inapplicable to the non-union plaintiffs in this case.

Courts "are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Section 7121(a)(2) permits parties to agree in a collective bargaining agreement to exclude a category of disputes from the negotiated grievance procedure. The government argues that the availability of judicial review under the amended § 7121(a)(1), renders "the statutory right [under § 7121(a)(2)] to bargain for the preservation of judicial remedies ... meaningless ...." *Mudge*, 50 Fed. Cl. at 504. This court disagrees. Prior to the 1994 amendment, excluding a subject from the negotiated procedures pursuant to § 7121(a)(2) served two functions in addition to preserving judicial review. First, and most obviously, excluding a subject foreclosed access to the negotiated procedures. Second, excluding a subject "opened up" alternative administrative fora. As the Federal Circuit noted in *Dunklebarger v. MSPB*, 130 F.3d 1476, 1478 (Fed.Cir.1997), "[t]he decision of the agency and the union to remove particular matters from the coverage of the negotiated procedures results in eliminating the employees' right to grieve such matters and leaving the employees with the sole option of appealing to the Merit Systems Protection Board." Although the functions of excluding a particular subject from the negotiated procedures are diminished by the amendment, they are not entirely destroyed. Weighed against the government's interpretation of the amendment, which risks rendering the term "administrative" superfluous, the court concludes that the amended provision should be interpreted in accordance with its plain meaning, which is supported by its legislative history.

Finally, the court turns to the government's argument that plaintiffs' interpretation would frustrate the main purpose of the CSRA. It is well settled that "[a] leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). In *Fausto*, the Supreme Court held that the CSRA "prevents" federal courts from exercising jurisdiction over claims "of the type governed" by the CSRA. 484 U.S. at 448, 455, 108 S.Ct. 668. As the Federal Circuit explained in *Bosco v. United States*, 976 F.2d 710 (Fed.Cir.1992):

> [t]he CSRA provides employees with procedural protections with respect to three general types of personnel actions: Chapter 23 forbids "prohibited personnel practices," such as discrimination, coercion of political activity, nepotism, and reprisal against "whistleblowers," 5 U.S.C. 2302 (1988); Chapter 43 covers removals and reductions in grade and pay based on unacceptable performance, 5 USC 4303; and Chapter 75 covers "adverse personnel actions"—removal, suspension, furlough, reduction in grade and pay—taken to "promote the efficiency of the service" (i.e., involving employee misconduct).

*Fausto* holds that these types of claims are channeled into the administrative remedial scheme.

The travel reimbursement dispute at issue in this case is not "covered" by the CSRA, except to the extent that the bargaining unit employees are covered by § 7121(a)(1). For the non-union employees, the CSRA does not prevent judicial review because this type of dispute does not fall within the terms of the CSRA. *See Worthington v. United States*, 168 F.3d 24 (Fed.Cir.1999) (exercising jurisdiction over a Back Pay Act claim founded on an underlying violation of the Federal Employees Flexible and Compressed Work Schedules Act, 5 U.S.C. §§ 6120–6133 (1994)); *Romero v. United States*, 38 F.3d 1204 (Fed.Cir.1994) (finding jurisdiction over a Back Pay Act claim founded upon an unwarranted withholding of pay for income tax purposes); *Bosco*, 976 F.2d 710 (asserting jurisdiction over a claim under the Prevailing Rate Act, 5 U.S.C. §§ 5341–5349).[7] As the Federal Circuit noted in *Bosco*:

---

7. Defendant also suggests that Congress has vested exclusive jurisdiction over travel-pay disputes

[In *Fausto,*] the Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA .... [T]he instant case involves a type of personnel action not covered at all by the CSRA, for any employees, whether of the competitive or excepted service .... Since the CSRA thus does not cover the action taken in the instant case, it and the holding of *Fausto* have no application here.

*Bosco v. United States,* 931 F.2d 879, 883 (Fed.Cir.1991), *aff'd on reh'g,* 976 F.2d 710 (Fed.Cir.1992).

For the unionized employees who are plaintiffs in this action, the CSRA, as it existed prior to the 1994 amendment, established an "unambiguous and unmistakable preference for exclusivity of arbitration." *Muniz,* 972 F.2d at 1309. However, the government's construction of the amendment elevates the CSRA's preference for arbitration over the plain meaning of the statutory text, and its legislative history. As the Supreme Court recently noted in a different context, "[w]hile ambiguities in the language of the [employment] contract should be resolved in favor of arbitration ... we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). Similarly, the CSRA's general preference for arbitration should not override the plain language and legislative history of the statutory amendment here.

*Exhaustion*

The government has asked the court to exercise its discretion to require the non-union plaintiffs to exhaust available administrative remedies. The non-union employees could have filed a grievance under the Corps' Administrative Grievance System. Plaintiffs argue that they "have already submitted the issue to defendant, internally," and that exhaustion would be futile. (Pls.' Mem. Resp. Def.'s Mot. Dismiss at 6.) The AGS and the negotiated procedures, however, clearly require non-union employees to sign and date a written grievance that contains a detailed statement of the grievance's substance and relief sought. (Def.'s Mot. Dismiss, App. at 46.) The non-union plaintiffs have failed to satisfy this requirement.

Additionally, plaintiffs argue that the AGS is not applicable by its terms because their grievance involves an issue that is not "under the control of management." According to plaintiffs, their dispute is not covered by the AGS because the Corp's Director of Human Resources stated in a letter to Congress that "there is no authority to pay residence to duty station commuting travel for these employees." (Pls.' Resp. Def.'s Mot. Dismiss, App. at Ex. C.) However, a statement by one agency official is insufficient to demonstrate that plaintiffs' grievances are outside the scope of the AGS.

■ Because the exhaustion of the agency's administrative grievance system is not mandated by statute, the court must exercise discretion in determining whether to compel the plaintiffs to first pursue redress through the AGS. *See Darby v. Cisneros,* 509 U.S. 137, 153–54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (citing *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)) (internal quotations omitted); *see*

in the Administrator of General Services, thereby implicitly revoking this court's Tucker Act jurisdiction over such claims. Section 3702(a)(3) of title 31 of the United States Code provides that "[t]he Administrator of General Services shall settle claims involving expenses incurred by Federal civilian employees for official travel and transportation, and for relocation expenses incident to transfers of official duty station." However, nothing in either the statute or this court's jurisprudence suggests that the statute is exclusive. Consistent with the statute's nonexclusivi-

ty, this court has exercised Tucker Act jurisdiction to adjudicate travel-pay disputes. *Deggins v. United States,* 39 Fed.Cl. 617 (1997); *Holley v. United States,* 33 Fed.Cl. 454 (1995); *Eastman,* 33 Fed.Cl. 293. Because § 3702(a)(3) neither vests the Administrator of General Services with exclusive jurisdiction over travel-pay disputes, nor strips this court of its Tucker Act jurisdiction to adjudicate claimed violations of money-mandating regulations, the court rejects defendant's argument.

also *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (Cl.Ct.1961) ("the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the discretion of the court."). The twin purposes of the exhaustion doctrine are to protect administrative agency authority and to promote judicial efficiency. *McCarthy,* 503 U.S. at 145, 112 S.Ct. 1081; *NTEU v. King,* 961 F.2d 240, 243 (D.C.Cir.1992). Both of these interests will be best served by requiring the non-union plaintiffs to submit their travel-pay dispute to the agency in accordance with the AGS. Requiring exhaustion will provide the Corps with the opportunity to take an official position regarding its obligation to reimburse plaintiffs for their travel expenses. Moreover, an outcome favorable to the employees under the AGS may render litigation unnecessary, thereby preserving judicial resources. Accordingly, the court remands the claims of the non-union plaintiffs to the agency for administrative exhaustion. *See* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *see also Davis v. United States,* 46 Fed.Cl. 421, 427 (2000) (remanding matter to Bureau of Justice Assistance for an eligibility determination and suspending case pending that determination).

## CONCLUSION

For the reasons discussed above, defendant's motion to dismiss for lack of subject matter jurisdiction is **DENIED,** and the non-union plaintiffs' claims are **REMANDED** to the agency for administrative exhaustion.

**IT IS SO ORDERED.**